**Irvin J. KUPPER, Appellant,**

v.

**FISCAL COURT OF JEFFERSON COUNTY,**
Kentucky, et al., Appellees.

Court of Appeals of Kentucky.

May 5, 1961.

As Modified on Denial of Rehearing
June 23, 1961.

Raymond C. Stephenson, Louisville, for appellant.

Charles W. Dobbins, James T. Carey, Oldham Clarke, Louisville, for appellees.

James W. Stites, Herman E. Frick, Asst. City Atty., W. Scott Miller, Louisville, William S. Riley, Bradford T. Garrison, Dept. of Revenue, Frankfort, Ky., amici curiae.

WILLIAMS, Judge.

The appellant, Irvin J. Kupper, filed a class action seeking a declaration of rights regarding the constitutionality of House Bill 244 adopted by the 1960 Session of the General Assembly (now KRS 68.180 to 68.195) and the resulting Resolution of the Fiscal Court of Jefferson County. The Jefferson Circuit Court, Macauley L. Smith, Judge, declared both the Act and the Resolution constitutional and valid. This appeal results.

The Act permits the fiscal court of a county having a population of at least 300,000 to impose an occupational license tax not to exceed one and one-fourth per cent of compensation earned or net profits received. The section specifically at issue here is now codified as KRS 68.190. It reads as follows:

"Any amount paid to any city of the first class within such county as a license fee, for the same privilege and for the same period, shall be credited

against the county license fee payable hereunder. Any amount paid to any other city within such county as a license fee, for the same privilege and for the same period, shall be credited against the county license fee payable hereunder, provided that such city, at least thirty days prior to the beginning of any county fiscal year, has contracted with the fiscal court to contribute annually to the support of joint agencies of such county and one or more cities in the county, an amount which bears the same ratio to the annual appropriation made for such joint agencies by a city of the first class in the county, as the assessed valuations for county tax purposes, as determined by the county tax commissioner, of the real and tangible personal property, excluding franchises, located within the corporate limits of such other cities, respectively, bears to the same assessed valuations within a city of the first class in said county."

The complained of portion of the Resolution embodies virtually the same language as employed in the Act.

Certain issues initially pleaded have been abandoned. The question now before the Court is two-pronged. First, is the Act special legislation, and thus prohibited by Sections 59 and 60 of the Constitution? Second, does it violate the uniformity provisions of Sections 171 and 181 of the Constitution?

■ The effect of the Act is to grant authority to the county to impose an occupational license tax for the work done, services performed and activities conducted in the county. This Court has heretofore held similar acts granting comparable powers to be constitutional. City of Louisville v. Sebree, 308 Ky. 420, 214 S.W.2d 248; Sims v. Board of Education of Jefferson County, Kentucky, Ky., 290 S.W.2d 491. It is unnecessary to reassert the reasoning set out in those opinions.

The basic difference between this Act and those examined in the cases above cited is the provision for allowance of credit on the county tax in the amount paid to a city situated in the county "for the same privilege and for the same period." It is argued that the allowance of a credit against a tax is nothing more or less than an exemption from that tax. Assuming that to be true, it is then alleged that the Act is special legislation and also violates the rule of uniformity which has been held to be requisite to constitutional legislation. Hager v. Walker, 128 Ky. 1, 107 S.W. 254, 15 L.R.A.,N.S., 195. Although the Constitution does not grant the dignity of absolute uniformity to the field of excise taxes, nor does it specifically prohibit the evils attendant to double taxation, nevertheless it has long been the legislative belief and judicial theory that the general purpose of that instrument is to avoid the inequities necessarily resulting from lack of uniformity or double taxation.

■ Before it can be determined whether this Act does in effect grant an exemption from tax it is necessary to distinguish between a tax exemption and a tax credit. In City of Winchester v. Winchester Waterworks Co., 149 Ky. 177, 148 S.W. 1, 3, an exemption is defined as follows:

" 'Exemption' means free from liability, from duty, from service. It is a grace, a favor, an immunity, taken out from under the general rule, not to be like others who are not exempt, to receive and not to make a return."

In other words, an exemption completely absolves a potential taxpayer from any liability for, or responsibility concerning, the tax whatsoever. A tax credit, on the other hand, relieves the taxpayer from direct payment of all or a portion of the particular tax on the theory that it has been satisfied by some other method. The taxpayer remains subject to all of the requirements of the tax law and is only permitted to set off against his tax liability any amount with which he has been properly credited.

Most states which impose personal income taxes allow a credit against the state tax for similar taxes paid to other states. Kentucky is among those which do. KRS 141.170. Kentucky also permits a credit to be taken for federal estate tax paid by a decedent's estate against the amount of Kentucky inheritance tax due. KRS 140.285. Credit on the fee for retail package and retail drink licenses issued by the State is allowed for one-half of any amount required to be paid to any county or city for the same privilege for the same year. KRS 243.080.

The Federal Government has long recognized the practicality of the use of tax credit. In State of Florida v. Mellon, 273 U.S. 12, 47 S.Ct. 265, 266, 71 L.Ed. 511, the Supreme Court held constitutional an Act of Congress authorizing a credit upon federal estate taxes of similar taxes paid under state laws. The credit allowed could not exceed 80 per cent of the federal estate tax. Florida contended the federal tax was not uniform through the United States because Florida had no similar tax which its citizens could credit against the federal tax. The Supreme Court held:

"The contention that the federal tax is not uniform, because other states impose inheritance taxes while Florida does not, is without merit. Congress cannot accommodate its legislation to the conflicting or dissimilar laws of the several states, nor control the diverse conditions to be found in the various states, which necessarily work unlike results from the enforcement of the same tax. All that the Constitution (Article 1, § 8, cl. 1) requires is that the law shall be uniform in the sense that by its provisions the rule of liability shall be [the same] in all parts of the United States."

In Chas. C. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 892, 81 L.Ed. 1279, the Social Security Act was challenged. That Act provides that a taxpayer who has made contributions to an unemployment fund under a state law may credit such contributions against an excise tax imposed by that Act. The total credit allowed to any taxpayer shall not exceed 90 per cent of the tax against which it is credited, and the state law must be certified to the Secretary of the Treasury as satisfying certain minimum criteria. The Supreme Court held the Act did not violate the rule against uniformity. Referring to the tax credit, the Court said:

"* * * Duplicated taxes, or burdens that approach them are recognized hardships that government, state or national, may properly avoid."

In discussing the criteria that the state law must satisfy, the Court said that if a credit was to be earned the state could not depart from those standards which in the judgment of Congress are to be ranked as fundamental. The state does not bind itself to keep the law in force, and the only consequence of repeal or excessive amendment of the law is that federal approval will end and with it the allowance of a credit. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 880, 81 L.Ed. 1245, involved the Alabama Unemployment Compensation Act, which did not apply to employers of less than eight persons, nor to certain specific classes of employers. Title IX of the Social Security Act permitted the taxpayer to credit up to 90 per cent of the tax paid to Alabama against the Social Security tax. The Court pointed out that the Legislature has broad discretion in the enactment of laws, and if there is a rational basis for its actions then when subjected to judicial scrutiny they will be presumed to be reasonable if there is any conceivable state of facts to support them. In the course of the opinion Mr. Justice Stone wrote:

"* * * The United States and the State of Alabama are not alien governments. They coexist within the same territory. Unemployment within it is their common concern. Together the two statutes now before us

embody a cooperative legislative effort by state and national governments for carrying out a public purpose common to both, which neither could fully achieve without the cooperation of the other. The Constitution does not prohibit such cooperation."

The common thread in both the Steward Machine Company case and the Carmichael case is the use of the tax credit as the device through which the coordination of the two political units was achieved. While an exemption might have been used to achieve the same result, it would probably have been unconstitutional as not meeting the test of geographical uniformity.

The United States allows a credit against income tax due of certain income taxes paid to a foreign government. In George W. Helme Co. v. United States, 23 F.Supp. 787, 792, 87 Ct.Cl. 474, a domestic corporation alleged discrimination in that it could take only a deduction in computing net income with respect to income taxes paid the various states, whereas a company which did both domestic and foreign business was allowed a credit against the United States tax for taxes paid to a foreign government. That Court said:

"The granting or denying of credits and deductions is a matter of legislative grace and is left to the sound discretion of Congress. Such provisions may be held invalid only when shown to be arbitrary and capricious or to result in gross and patent inequalities."

And in Biddle v. Commissioner of Internal Revenue, 302 U.S. 573, 58 S.Ct. 379, 381, 82 L.Ed. 431, the Supreme Court said:

"The power to tax and to grant the credit resides in Congress, and it is the will of Congress which controls the application of provisions for credit."

Both the Constitution of Kentucky (section 171) and the Constitution of Pennsylvania (Article IX, section 1) P.S., provide that taxes shall be uniform upon the same class within the territorial limits of the authority levying the tax. In June 1947, Pennsylvania passed an Act (P.L. 1145, 53 P.S. § 2015.1) giving political subdivisions authority to tax persons, occupations and subjects within their territorial limits and allowing credit of a tax paid to the political subdivision of a taxpayer's residence against a like tax levied by any other political subdivision. That Act was amended May 9, 1949 (P.L. 898, 53 P.S. § 2015.1 [1]) to provide that, where the person or the subject of taxation is located within both of two political subdivisions, there· must not be a duplication or aggregation of taxes exceeding the permissible limit, but consideration must be given by the one political subdivision to the tax imposed by the other. The 1947 Act was construed by the Pennsylvania Superior Court to mean that a taxpayer could credit a tax paid the district of his residence against a like tax levied by another political subdivision of which he is not a resident, but the credit would not be allowed against a tax levied by another political subdivision of which he is also a resident. Glen Alden Coal Co. v. Thomas, 165 Pa.Super. 199, 67 A.2d 754. The 1949 Amendment was construed by the Supreme Court of Pennsylvania in Minich v. City of Sharon, 366 Pa. 267, 77 A.2d 347, 349, as allowing a credit to a taxpayer resident in both of two coterminous political subdivisions. That Court flatly stated:

"Allowing a credit against the payment of a tax for taxes paid to some other governmental authority is not a violation of the constitutional requirement of uniformity."

And

"The credits provided for in the Act * * * are all the more legally justified because the tax for which the credit is allowed is on the same subject as the tax against which the allowance is made."

1. Now 53 P.S. § 6851.

It is interesting to note that both California and Utah have enacted laws which set up a coordinated system of county-state sales and use taxation. The system is graphically set out by the California Supreme Court in Geiger v. Board of Supervisors of Butte County, 48 Cal.2d 832, 313 P.2d 545, wherein that Court said:

"In 1955 the Legislature enacted a uniform local sales and use tax law, hereinafter referred to as the Bradley-Burns Act. Rev. & Tax Code, §§ 7200–7207. It authorizes a county board of supervisors to adopt an ordinance imposing a one per cent tax on retail sales of tangible personal property and a use tax at the same rate, and it provides that the county must credit against the amount of the county tax the amount of sales and use taxes due to cities under ordinances having substantially the same provisions.

" * * * The act contemplates an integrated, uniform system of city and county sales and use taxation. The counties are given authority to impose sales and use taxes as a means of raising additional revenue, and the cities are furnished with a plan of state administration which will relieve them from operating collection systems of their own. The taxpayers will receive the benefit of a scheme which will free them from the burden of complying with differing regulations of state and local taxes, avoid the necessity of making payments and reports to several governmental bodies, and permit all auditing to be done by a single agency. The method devised provides for the equitable sharing of revenue by a county and the cities within its boundaries. It is intended that there will be concurrent action by a county and the cities in the county for the purpose of adopting an integrated system of local sales and use taxation, and the city ordinances adopted under the authority of the act are apparently made contingent

upon the existence of a county tax ordinance. Retailers are entitled under the statute to credit against the county tax the amount of sales and use taxes due to the city in which the business is located, provided the city tax is levied under an ordinance which incorporates certain specified provisions. A city system adopted pursuant to the act is substantially the same as that prescribed for the county and the state, and the city tax like that of the county, is to be administered by the State Board of Equalization. * * *"

See also City of Pomona v. State Board of Equalization, 53 Cal.2d 305, 1 Cal.Rptr. 489, 347 P.2d 904.

In each of the above-noted cases the use of the tax credit was before the Court. The Pennsylvania Court, in the Minich case, met the problem head-on. The California Court, in the Geiger case, adopted the tax credit device as a new friend without any undue concern over its use. The federal courts have, without exception, approved the use of tax credits for the purposes for which they were designed.

■ Here the tax is applied uniformly throughout the entire county. No property is exempt from taxation. No person is exempt from the duties imposed by the tax. Allowance of credit is authorized for those persons who have become liable for a tax against a tax liability for the same privilege and for the same period this Act encompasses. The taxpayer is not excused from liability of a county tax in any way, but he is relieved of payment thereof in the amount he has paid a city for a like tax for that period. Every taxpayer, regardless of where he works, is taxed for the same privilege. The credit device assures that payment for that privilege shall be equal among all taxpayers. In the venerable treatise on taxation, Cooley, Vol. 1, 4th Edition, section 262, it is noted that equality of taxation means equality of sacrifice, i. e., the apportioning of the contributions of each person towards the expenses of gov-

ernment, so that he shall feel neither more nor less inconvenience from his share of the payment than every other person experiences from his.

We are requested to and do take notice that both the county and the cities therein have problems which are mutual and cannot be distinguished. Louisville and Jefferson County have made and must continue to make joint efforts to control those problems. The rapid growth of population, as well as increased demand for social and economic improvement, have caused the burden of government to become more complex with each passing year. As the burden increases the need for revenue increases proportionately. No longer can one area isolate itself and conquer its problems alone. There must be a cooperative sharing of services and expenditures by the various units if the requisite services are to be performed. A political unit which performs services contributing to the general burden benefits not only itself but also any other unit which is required to perform the same services. In like manner a taxpayer who contributes to one unit for the performance of such services is in effect contributing to the whole and should not be required to duplicate his burden.

The Act sets up certain requirements which cities, other than Louisville, must meet before a credit may be taken. Those requirements basically place all cities in the county on a proportionately equal footing. We do not assume that the Legislature acted arbitrarily in setting up those requirements. For the city taxpayer to be entitled to enjoy the benefits of the credit device his tax expenditure must have been made in furtherance of the common goal. This the Legislature has assured by restricting the use of the credit to those political units which share proportionately the common burden.

The tax imposed here is for the benefit of the entire county. A like tax imposed by any city in the county also inures to the benefit of the whole. Each is for the same privilege, for the same period and for the same purpose. A credit against one by payment of the other assures an equal payment by all taxpayers and does not amount to an exemption from taxation. Had it been the legislative intent to impose double taxation on any taxpayer, the law would have clearly so indicated. Obviously, such was not the intent.

We do not find in the Act and the Resolution any violation of guaranties under the Kentucky or Federal Constitutions.

All matters other than those discussed herein are specifically reserved.

The judgment is affirmed.

BIRD, C. J., and PALMORE, J., dissenting.

PALMORE, Judge.

The majority opinion permits a vital constitutional safeguard to be trampled beneath the stampede for new sources of municipal revenue. Relief, whether it be wholly or in part, of some of the taxable class from payment of the tax on the sole ground that they pay a similar tax to another governmental unit violates what I consider to be the fundamental principle of uniformity, under which no discrimination can be upheld unless it is "founded on a natural and reasonable basis, with a logical relation to the purposes and objectives" of the enactment. Quotation from City of Louisville v. Sebree, 1948, 308 Ky. 420, 214 S.W.2d 248, 256. The violation is all the more vicious in this case because the favored class obviously will comprise such a large segment of the population in Jefferson County that those who are affected can scarcely exert any effective influence to protect themselves through their voting power.

Though most of the decisions cited in the majority opinion can be distinguished in principle from this case, I concede that Minich v. City of Sharon, 1951, 366 Pa. 267, 77 A.2d 347, is analogous. But the fact

that the courts of Pennsylvania and certain other states have welcomed in the tax credit a "new friend" without examining its teeth is no reason why we should not think for ourselves. A reading of the Minich case will demonstrate to the satisfaction of any impartial judge that no real effort was made to probe the fundamental nature of the problem. Why should we go howling after the pack simply because it is expedient?

To say that a credit against a tax is anything but a type of exemption, or is sustainable on any basis different from that by which an exemption must be tested, is the merest of fiction and pretense. Who would contend, for example, that losses at the race track could be offset against the bettor's occupation tax by the device of calling it a credit? And why not? Simply because a credit, or a deduction, or an exemption, or whatever else it may be called, that sets the taxpayer in a different class from the others subject to the tax must rest on some sound distinction.

Had the majority opinion said frankly that there exist in Louisville and Jefferson County problems of fiscal management that justify whatever discrimination may result from relieving, wholly or in part, city taxpayers from county taxation so long as it does not result in an obviously disproportionate distribution of the overall city-county tax burden, its very simplicity would have carried a certain rugged virtue. But instead, here is the heart of the opinion: "The taxpayer is not excused from *liability* of a county tax in any way, but he is *relieved of payment* thereof in the amount he has paid a city for a like tax for that period." (Emphasis added). This masterpiece of semantic logic reveals the full sophistry of the "credit" theory. Liable, but doesn't have to pay! To those who *do* have to pay, I suspect this gambit will bring more edification than comfort.

The credit allowed the Louisville taxpayers is not a deduction or exclusion from the amount of income by which the tax is measured, but from the tax itself, and is thus a pro tanto exemption based on what is paid to the city. A similar credit is applied to license fees paid to any other city within the county *if* such other city has contracted to contribute annually to the support of joint city-county agencies a sum bearing the same ratio to the annual appropriation made for that purpose by the first-class city as the county-assessed tangible property within such other city bears to the same assessed valuation within the first-class city. Therefore, the credits provided by the county occupation tax law are directly affected and subject to change by the independent actions of the various cities involved. Moreover, by judicial notice it may be recognized that a very substantial number, if not the great majority, of those whose occupations are otherwise subject to the county tax will be effectively exempt from it by virtue of the concentration of Jefferson County's business and industry in the City of Louisville, which also currently levies a 1¼% occupation tax.

The "fundamental idea of taxation is that the burdens shall be borne equally and alike by all persons, and that no one class shall be taxed for the benefit of another, * * * or an exemption allowed one that is not conceded to another. * * If a few, or any number of persons less than all, who follow a designated trade, occupation, or profession may be exempt, while the others are taxed, the law imposing the tax would not be general, but special or local, and forbidden by sections 59 and 60 of the Constitution." Carroll, C. J., in Hager v. Walker, 1908, 128 Ky. 1, 107 S.W. 254, 258, 32 Ky.Law Rep. 748, 15 L.R.A., N.S., 195, 129 Am.St.Rep. 238.

The purpose of the occupation tax is not to regulate, but to raise revenue. City of Louisville v. Sebree, 1948, 308 Ky. 420, 214 S.W.2d 248. The privilege of doing business in the county, which is the basis of the tax, is enjoyed equally by those who work in the cities and those who work in

the county but outside the cities, by those whose occupations are carried on in Louisville and those whose employment is elsewhere in the county. All are within the same county. By what sound principle, then, can those who pay an occupation tax to Louisville, or any other city, to that extent be relieved from a tax that must be paid by others for the same privilege?

The only answer suggested in behalf of the appellees is that the City of Louisville annually contributes some three million dollars toward the support of various city-county agencies. But assuming for the moment that the whole of the city's annual contribution goes to the sole benefit of the county, the record does not indicate what portion of the city occupation tax is represented by the contribution, as would seem requisite to any inquiry into whether payment of the city tax might be considered a reasonable basis for exemption from the county tax. In short, if the city should pay 50% of its occupation tax revenue outright to the county, what would be the basis of a 100% credit against the county tax? Moreover, still proceeding on the assumption that the city's annual contribution to the joint agencies is for the benefit of the county, what becomes of the basis for the credit if the city decides to reduce or even discontinue its annual appropriations for that purpose? So far as the act is concerned, the credit allowed for payment of the Louisville tax does not in any way relate to or depend on that city's support of the joint agencies. Be all that as it may, however, the assumption that some or all of the city tax is turned into a county-wide benefit cannot be indulged, because, as pointed out in City of Lexington v. Hager, Ky.1960, 337 S.W.2d 27, 28, "taxes may be levied and collected only for a public purpose of *the particular tax levying unit,*" from which it must be presumed that where a city and county share in a joint operation the contribution of each reflects the benefits accruing to itself as a separate political unit. Joint financing of programs in which both city and county have a valid public function is certainly proper, but in such cases whatever is paid by the city is considered to be for its own public purposes, not the county's. Cf. City of Lexington v. Hager, supra. It is therefore apparent that relief from the county tax on the theory that the city tax achieves the same public purpose will not bear careful analysis.

A primary reason for incorporation of a city is to gain additional taxing powers in order to support the services required by the concentration of population. By this means those who choose to live, work or hold property in the city are able to secure public benefits that could not adequately be provided to them under the county tax structure. Urban life is simply more expensive, and the classic theory is that those who wish to enjoy it must pay for it—not by city taxes levied in lieu of county taxes, but by city taxes levied in addition to the taxes necessary to operate the county government. So it is clear that what the court has done in this case is to initiate the destruction of that theory by approving the concept that there may be city taxes *in lieu* of county taxes.

Under the Constitution of Kentucky cities, counties, and the state are completely separate political units, each with its own taxing power. The additional burden of city taxation has never served as the basis for relief from county or state taxation. (The liquor license fees mentioned in the majority opinion are imposed as a police measure, for purposes of regulation rather than revenue.) Except for the presumption that the expense of city government represents additional benefits enjoyed by those who are subject to city taxation I see no reason why city property might not be separately classified and subjected to a different and lower rate of county or state ad valorem taxation. Moreover, if we assume, as a reasonable basis for special tax treatment, that the county derives from the city's existence within its boundaries

benefits outweighing the burdens incident to that circumstance, we can scarcely avoid the conclusion that the same would be true of every city-county relationship, leaving no proper basis for singling out the county containing a city of the first class.

It might be argued that if all occupations in Jefferson County are subjected to a 1¼% tax no harm is done if part goes to the cities and part to the county, that in the last analysis the overall tax burden is thereby equalized. Viewed through that facet, the plan appears deceptively plausible. The flaw is that equality of the overall, conglomerate tax burden as between two different taxpayers, irrespective of the heterogeneous identities of the taxing authorities to which the various taxes are paid, cannot in any sense be a sound test of uniformity. If it were, the tax revenue of any particular political unit could be fluctuated by the independent actions of every other taxing unit to which any of its taxpayers were subject. Moreover, a wealthy taxpayer could be given all sorts of credits not allowed to the less fortunate, on the theory that it would "equalize the overall burden" between them. This approach just doesn't make good sense. The rule of uniformity can logically apply only to taxes levied by a particular taxing authority, and not to the aggregate burden imposed by two or more non-identical political units.

The ultimate effect of the legislation under consideration is to establish for the county a new source of revenue subject to a right on the part of the City of Louisville and, to a qualified extent, on the part of other cities in the county, to pre-empt a major portion of it. The result is that so long as the city occupation taxes are levied those who pay the county tax must necessarily contribute more than their proportionate share to the support of the county government, for the simple reason that they do not pay the city taxes. I see no natural or reasonable basis for such a classification.

There are other problems in this case which the majority opinion simply brushes off. One is the coercive force the law applies against smaller cities in Jefferson County by making the credit contingent on (1) the levy of a similar tax and (2) a contribution to joint city-county agencies in an amount dependent on the Louisville contribution. If the smaller city chooses a revenue-raising method different from the occupation tax there is no relief, regardless of what amount it may choose to contribute to the joint agencies. On the other hand, regardless of how large an occupation tax it may impose, there is no credit unless the city makes the same proportionate contribution as the City of Louisville. The credit allowed its taxpayers is dependent on what Louisville does. But there is no similar limitation with respect to Louisville; its taxpayers receive the credit even if Louisville completely withdraws its support of the joint agencies. Whether and what the other cities are contributing is immaterial. Where is the constitutional "uniformity" on this one-way street?

The order of the fiscal court fixes on the Board of Sinking Fund Commissioners of the City of Louisville various administrative duties that might well be agreed upon by the board, but which the fiscal court certainly has no power to impose unilaterally, as it has done by its order in this case. The order also confers on the board enforcement authority, including the powers of subpoena and examination of persons and parties under oath. Can we rightfully "reserve" judgment of those unauthorized and invalid provisions, so patent on the face of the order, on the ground that they have not been questioned in the briefs? If so, then we impliedly permit lawyers in future cases to make valid that which is obviously invalid by the simple device of not raising the question.

In concluding, I think it appropriate to cite again the inherent evil of non-uniformity: "A weighty reason, too, in favor of uniformity, is * * * that it is important

that the representatives of the people in the lawmaking department of the government shall all be directly interested in behalf of their constituents in laws involving the subject of taxation. A member of the Legislature might be willing to vote a tax upon trades, occupations, and professions in other districts than his own. * * * But, if the constituents of the member—the people to whom he is immediately responsible—are to bear their share of the burden imposed, they would all be interested in seeing that it was fairly and equally distributed, and their desires and interests would naturally have their weight. This restrictive influence is not to be underestimated in dealing with questions of this character." Carroll, C. J., in Hager v. Walker, supra [128 Ky. 1, 107 S.W. 257].

Considering the concentration of business and industry in Louisville, it seems reasonable to assume that a substantial majority of the people employed or doing business in Jefferson County are subject to the Louisville occupation tax. Those people have nothing to lose by a tax that does not strike them. To put it in plain English, their silent acquiescence is bought by the exemptive credit. The weight of their influence in the selection of the county's lawmakers is a force against which the members of the limited group on whom those lawmakers have seen fit to saddle the main burden of the tax have no real protection except in the Constitution. By refusing to accord them that fundamental and important protection the majority of this court has leveled a gun against the rural people of Kentucky, who may now be forced to do by indirection what they cannot be required to do directly—that is, through the imposition of a disproportionate share of the expense of county government they can be made to contribute to the upkeep of cities in which they neither live nor work. I strongly dissent from such a result.

BIRD, C. J., concurs in this dissent.